Estate of Fred Arbogast, Deceased, Nellie E. Arbogast, * Executrix v. Commissioner. Estate of Fred Arbogast v. Commissioner
Docket No. 11950.
United States Tax Court
1948 Tax Ct. Memo LEXIS 223; 7 T.C.M. (CCH) 211; April 6, 1948
*223 Held, deduction in excess of amounts actually paid to taxpayer's father in taxable years not allowable under section 23 (a)(1), I.R.C., as reasonable compensation for his services rendered in taxpayer's business. Further held, amounts of $6,000 paid to wife and $3,000 each to son and daughter of taxpayer in fiscal years 1942 and 1943 not allowable as reasonable compensation for services rendered by them in taxpayer's business. Further held, no part of the deficiencies for the fiscal years 1942 and 1943 was due to fraud with intent to evade tax. Consequently, imposition of fraud penalty was in error. Donald Gottwald, Esq., 1101 First Central Tower, Akron, Ohio, and O. H. Chmillon, Esq., 920 Southern Bldg., Washington, *224 D.C., for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income taxes and penalties as follows: Year Ended
Deficiency
50% Penalty
5% Penalty
September 30, 1941
$ 6,440.38
$322.02
September 30, 1942
47,777.10
$23,888.55
September 30, 1943
25,663.52
12,831.76 The questions presented are: (1) was any part of the deficiencies for the fiscal years ended September 30, 1942 and 1943 due to fraud with intent to evade tax and consequently, subject to the penalty of 50 per cent; (2) were an amount equal to 25 per cent of the net profits of decedent's [1] business, and amounts of $6,000, $3,000 and $3,000 deductible in each of the years involved as compensation to decedent's father, wife, son and daughter, respectively; and (3) was decedent entitled to the benefits of section 6 of the Current Tax Payment Act of 1943? Findings of Fact The petitioner was, on November 3, 1947, appointed by the Probate Court of Summit *225 County, State of Ohio, as executrix of the estate of Fred Arbogast, her husband, who died testate on October 27, 1947. Taxpayer's returns were filed on a fiscal year basis, the fiscal year ending September 30. Since the summer of 1925 and during the taxable years, Fred Arbogast, hereinafter referred to as the taxpayer, was engaged in the business of manufacturing and selling fish baits and lures, which he had developed over a period of many years. During the first seven months after the start of the business he was employed at the Firestone Tire & Rubber Co., but thereafter devoted his entire time to the business. He started the business in his home in Akron, Ohio. His wife, Nellie E. Arbogast, was his only helper for about a year. In about 1926 or 1927 taxpayer's father, J. A. Arbogast, then about 63 years of age, came to live with taxpayer and his family, consisting of his wife and two children, a son, Allen, then about five years of age, and a daughter, Eleanor, then about four years of age. The business continued to be conducted in taxpayer's home, with the assistance of his wife and father, until the spring of 1929, when it was moved to the Mohawk Building in Akron. In the fall *226 of 1932 the business was moved to 313 West North Street, Akron, where it has been located ever since. Taxpayer and his wife had nominal savings when he first started the bait business. Later his father loaned him $1,000, which was repaid at some time prior to the taxable years. Up to the fall of 1932, in addition to members of his family, taxpayer had only one employee. After his father joined him, the taxpayer limited his interest to the manufacture, testing, improvement and sale of bait. When not out on fishing trips experimenting with new bait or absent because of illness, he spent most of his time in the factory, leaving the office and clerical work to his father. However, he occasionally checked orders and his bank balances from time to time to ascertain in a general way whether or not the business was progressing, the need of the business in the way of materials and supplies and his financial status. Late in 1939 or early 1940 the decedent, then about 45 years of age, became ill. His condition was later diagnosed as incurable pernicious anemia. He was in People's Hospital in Akron for a week. Later he went to Johns Hopkins at Baltimore, Maryland. His illness during the *227 first two years became progressively worse. Subsequently he went to the Cleveland Clinic and in August, 1942, to the Mayo Clinic in Rochester, Minnesota. After that time he made periodic visits to Mayo Clinic, first at sixmonths intervals and from 1946 on, at yearly intervals. Just prior to Thanksgiving Day in 1942, taxpayer and his wife drove by automobile to Winter Haven, Florida. They returned to Akron the day before Christmas, 1942. While in Florida, the taxpayer was ill at times but did considerable fishing, both to try out the quality of old baits and to experiment with new ones. The taxpayer at all times paid for the support of his wife and two children and for the maintenance of their home, as well as for the education of his two children, including their high school and college education. Taxpayer's father was a lawyer who had engaged in the general practice of law in Akron, Ohio. Immediately prior to his coming to live with his son in 1926 or 1927 he was engaged in operating a coal mine in West Virginia. At first he assisted taxpayer in molding baits, then gradually took over the bookkeeping and writing of letters. As time went on he exercised general supervision *228 over the office, and in addition to doing most of the bookkeeping, he usually handled finances, paying all bills, hiring of employees, purchasing of materials and supplies. He devoted all of his time to the business. The taxpayer had one checking account carried in his name at the Dime Savings Bank of Akron. Checks, having the name of taxpayer printed above the signature line, drawn on that account signed by either taxpayer or his father, were honored by that bank. Most of the checks issued were signed by the father. Taxpayer's father prepared or caused to be prepared the income tax returns of decedent for the taxable years, as well as all returns filed during such years by taxpayer's wife, son and daughter. Such returns were signed, without question or without more than cursory examination, by each of them when presented to them by the father for signature. The taxpayer's return for the fiscal year 1942 was prepared and the name of taxpayer written in by his father and was filed December 18, 1942, while taxpayer was in Florida and without examination by him. Taxpayer's returns for the fiscal years 1941 and 1943 were stated to have been prepared on the cash basis. Taxpayer's *229 father remained active in the business until his death in November, 1946, at the age of 82. In about 1937, taxpayer's father employed a girl, just out of high school, as bookkeeper and office assistant, at first part time and later in about 1939 at full time at about $15 a week. While so employed, her duties included, among others, the opening of mail, preparing catalogs for mailing, writing invoices, filing, making up the payroll, preparing bank deposits and sometimes making the deposits, and some of the bookkeeping. She left taxpayer's employ about June 1, 1944, at which time she was receiving a salary of about $35 a week. The books of account of taxpayer's business consisted of a small cash receipts book, a cash disbursements book, and a memorandum expense ledger. A record was also kept of sales which were subject to excise tax. The books were kept on a single entry basis without any attempt to balance or prove their correctness at any time. The bookkeeping system used was inadequate and unreliable. Most of the entries in the books of accounts and check books for the taxable years were in the handwriting of taxpayer's father. No inventory records were kept. No proper physical *230 inventories were ever made. A rough inventory was made as of October 1, 1942 and as of October 1, 1943, each on a single sheet of paper, totaling $27,261.40 and $9,935, respectively. These inventories were priced at replacement value for insurance purposes. They were made by taxpayer's father. The Commissioner determined that taxpayer's net income derived from his business for the fiscal year 1941 was $37,286.50. Considerable purchases of "spinners and bodies" were made during the fiscal year from Pfahl Gauge & Manufacturing Co. for which no bill had been rendered or received by taxpayer. At the end of the fiscal year, taxpayer's father estimated the cost of such purchases as $8,000 and made a notation in pencil in the memorandum expense ledger for the fiscal year 1941, thus increasing the amount of purchases charged to the account from $237.76 to $8,237.76. This was the last entry on that account and it was not closed or balanced at the end of the fiscal year. A bill was later received and paid on December 31, 1941, in the amount of $6,603.49. This amount was entered in the memorandum expense ledger for the fiscal year 1942 and included in purchases for the fiscal year 1942. The *231 $8,000, not having been paid in the fiscal year 1941, was restored to income by the Commissioner, designated as "Spinners and bodies expense overstated." The Commissioner determined that taxpayer's net income derived from his business for the fiscal year 1942 was $96,256.57. The Commissioner determined that taxpayer's net income derived from his business for the fiscal year 1943 was $61,306.18. In computing the reported net income, taxpayer's father used a hybrid system. The sales included cash sales and sales invoiced but not paid for. The expenses included accounts paid and expenses incurred but not paid for. In computing the deficiencies, the Commissioner used the cash receipts and cash disbursements basis as to sales and expenses. The compensation for taxpayer's father deducted in the returns of taxpayer for the fiscal year 1938 to 1943 inclusive, and the amount allowed by the Commissioner in the taxable years, are as follows: Taxable
Amount
Years
Deducted
Designated as
Amount Allowed
1938
Not shown
1939
$ 1,000.00
J. A. Arbogast, Secretary
1940
2,000.00
Bookkeeper, J. A. A.
1941
6,023.86
Contract - 1/4 of Profits, for services, to J. A. Arbogast
$ 1,448.14
1942
12,000.00
J. A. Arbogast - Contract for services - 1/4 of profits
11,992.37
1943
12,000.00
J. A. Arbogast - Contract for service
10,616.37
*232 The total receipts or sales and net income reported in taxpayer's returns for the fiscal years 1938 to 1944 inclusive, after deduction of compensation for his father and $12,000, additional compensation deducted for taxpayer's wife and two children, are as follows: Fiscal Year
Sales
Net Income
1938
$ 31,298.18
$ 6,706.77
1939
69,579.61
11,288.22
1940
131,081.63
10,135.95
1941
222,007.40
18,071.56
1942
303,946.00
20,102.87
1943
206,714.60
22,381.73
1944
251,405.92
40,269.10
In the return for the fiscal year 1942 the amount of excise taxes deducted was $30,394.60, which was allowed. The cash sales for each of the fiscal years 1939 to 1943 inclusive, as shown by a statement of monthly cash sales prepared by the assistant bookkeeper and contained in a cash book labeled "Cash October 1, 1942 to October 1, 1943", are as follows: Fiscal Years
Cash Sales
1939
$ 69,579.61
1940
131,081.63
1941
222,081.67
1942
346,900.95
1943 (11 months
10/1/42-8/31/43)
180,307.28
In computing reported net income for the fiscal years 1938 to 1941 inclusive, no inventories were used. In the schedule attached to each return *233 in which net income derived from taxpayer's business was computed, the following statement was made: "Inventories, Bills Receivable and Bills Payable, not being taken into account, being practically the same from year to year." Although no inventories were used in computing reported net income for the fiscal year 1941, the Commissioner allowed a deduction in that year of $1,564.27, designated "Inventory adjustment." There is no explanation in the record as to this adjustment. In the computation of net income, as shown in the schedule attached to the return for the fiscal year 1942, inventories were used by petitioner as follows: Inventory October 1, 1941
$48,116.70
Inventory October 1, 1942
27,261.40
Decrease
$20,855.30 In computing the income from business for that year the Commissioner disallowed the deduction for decrease in inventories of $20,855.30 to the extent of $19,291.03, and allowed the deduction to the extent of $1,564.27, the same amount allowed the previous year. In the computation of net income, as shown in the schedule attached to the return for the fiscal year 1943, a deduction of $17,326.40 was taken for "Decrease in Inventory", without *234 disclosing the amounts of opening and closing inventories. The Commissioner disallowed such deduction to the extent of $15,762.14, and allowed a deduction of $1,564.26. Late in 1940 or early 1941 materials used in the manufacture of fish bait or lures were becoming scarce. At the suggestion of taxpayer's father more materials were purchased than theretofore. The purchases of materials made during the fiscal years 1938 to 1944 inclusive, as shown by taxpayer's returns, are as follows: Amount of
Fiscal Year
Purchases
1938
$ 6,311.91
1939
16,354.35
1940
39,544.41
1941
75,109.25
1942
84,051.43
About 90 per cent of the sales were due to advertising in sports magazines. In addition, circulars, and later catalogs, were prepared and mailed out to prospective purchasers. As a rule these were mailed out seasonally. Taxpayer prepared and set up his own advertisements and catalogs. In doing so he requested and received suggestions from the members of his family, particularly his daughter. The advertisements as prepared by him were, however, submitted to an advertising counsel to whom was paid a commission of 7 1/2 per cent. The amounts paid for printing, advertising, *235 postage and catalogs, as shown by taxpayer's income tax returns in evidence, were as follows: Fiscal Year
Printing
Advertising
Postage
Catalogs
1938
$1,042.24
$ 6,987.22
$ 729.05
1939
954.76
18,747.90
1,640.14
$1,268.29
1940
3,619.91
38,797.03
2,765.41
1941
2,327.39
58,375.51
2,643.89
1942
2,206.83
40,395.26
1,878.65
1943
2,443.00
22,665.25
1,006.88
1944
1,483.08
47,938.41
1,076.71
At the suggestion of his father, taxpayer signed three agreements prepared by his father and all bearing date of October 1, 1941, one of which reads as follows: "This agreement of partnership made the first day of October 1941 by and between Fred Arbogast and Nellie M. Arbogast, witnesseth: "This partnership shall apply to the profits, only, of the fishing tackle business of Fred Arbogast and shall not apply to any other property of assets of Fred Arbogast, nor shall this partnership make the said Nellie M. Arbogast nable for the debts of said Fred Arbogast beyond her distributive share of profits. Both partners agree to devote their knowledge, time and skill to the management of the business at no charge beyond the amount of their distributive *236 shares of profits, and the distributive share of profits of each partner shall be accepted by such partner as full compensation for the services of such partner. "The said Nellie M. Arbogast shall receive one-tenth of the net profits of said fishing tackle business as determined by the report made for Federal Income Taxes and Fred Arbogast shall receive the remainder. "This partnership may be terminated at any time by either partner. "In testimony whereof we have signed this agreement the date above written. [signed] "Fred Arbogast Nellie M. Arbogast" The other two agreements were identical in form except that, instead of the name of the wife, in one the name of the son, Allen Arbogast, and the other the name of the daughter, Eleanor Arbogast, appears and the distributive share of the profits each was to receive is five per cent instead of ten per cent. The above agreements were presented at different times by taxpayer's father for signature to taxpayer's wife, son and daughter, respectively. Each signed without question. Each read the document in a superficial way and each was unable to state whether the signature of taxpayer was on the document at the time signed *237 by them. The subject matter of the agreements was not discussed by his wife, son or daughter with taxpayer before each signed the agreement and no discussion was had thereafter. Checks on taxpayer's bank account signed by his father were given by the latter to the wife, son and daughter, pursuant to the agreements, as follows: June 15,
Sept. 30,
Oct. 28,
1942
1943
1943
Nellie Arbogast
$6,000
$4,800
$1,200
Allen Arbogast
3,000
2,400
600
Eleanor Arbogast
3,000
2,400
600 The above checks were accepted by taxpayer's wife, son and daughter respectively, without question and without inquiry as to whether the amount received represented the share of the profits to which each was entitled under the agreements. The wife of decedent did her own housework and took care of her children. She was never regularly employed in the business but helped out when needed after her household duties had been completed, usually in the evening and at home. The work performed by her included sorting feathers for the bait, sewing bait on cards, boxing bait, and putting catalogs in envelopes for mailing. The mailing of catalogs was usually a seasonal rush job. She *238 also accompanied her husband on many of his experimental fishing trips, on which trips she would observe and report to taxpayer the action of the bait in the water as it was cast by him so that he could then change the bait to accomplish the purpose he had in mind. During the early years of the operation of the business she received $15 a week. This included compensation for her services and also "pin money." Later and during the taxable years she received $25 a week. She used these weekly payments as she pleased, not spending them for the household or clothing. In the latter part of 1941 Allen Arbogast was about 20 years of age. He graduated from grade school at 13, from high school at 17, and enrolled in the University of Akron in September 1938, graduating in February 1943. He entered military service May 28, 1943 and was away from home for two and one-half years. He remained in this country until 1944. Allen helped in his father's business at an early age. While going to school he worked in the office and factory from time to time after school hours, sometimes in the evening, weekends and during summer vacations. He helped in molding bait, in assembling bait, packing bait in *239 boxes for shipment, shipping them out, and inclosing catalogs in envelopes and addressing and mailing same. When he was about 14 years of age he was paid for such work 10 or 15 cents an hour. His pay was gradually increased and during the taxable years he received about $30 or $35 a week. In the latter part of 1941 Eleanor Arbogast was about 19 years of age. She attended high school in Akron. In 1939 she enrolled in Akron University and attended there one school year. During the following school year she attended the University of Iowa. From the fall of 1941 until the end of May, 1942, she attended the University of Arizona at Tucson, Arizona. During the summer vacation of 1942 she attended the University of Akron, taking two courses. She returned to the University of Arizona in the fall of 1942 and graduated in May, 1943. After she returned home in May 1943 she worked regularly at her father's place of business until the latter part in July, 1943, when she entered the employ of the telephone company in Akron as office service representative at a salary of $21 a week. She worked 40 hours a week for the telephone company and her duties consisted of answering inquiries pertaining *240 to bills and explaining the services rendered by the company to customers. Eleanor helped out at her father's place of business at times after school, on weekends and during vacation periods. She helped out in the office and factory as directed by her grandfather. She also helped her father in the preparation of advertising and catalogs by giving him her suggestions and opinion as to wording, form and layout and as to magazines in which to advertise. She did this while at home and when away at college through correspondence with her father. She received payment for services rendered by her and when regularly employed was paid a salary. Whatever money Allen and Eleanor received as wages or salary from their father's business was in addition to the money expended by their father for their support, maintenance and education. From May 13, 1942, to August 4, 1943, inclusive, the decedent withdrew by checks signed by himself from his checking account, a total of $95,860.41 with which he purchased bonds, stocks and insurance, as follows: Date
Description
Amount Paid
May 13, 1942
$4,000 par war bonds each for wife, son and daughter
$ 9,000.00
Nov. 20, 1942
Industrial stocks
22,250.00
Jan. 22, 1943
100 shares A.T. & T.
13,485.25
Feb. 24, 1943
2 insurance policies
6,931.30
Mar. 18, 1943
1 insurance policy
3,215.70
Apr. 23, 1943
$5,000 par bonds
3,750.00
May 5, 1943
Bonds
7,500.00
May 14, 1943
4,047.56
June 11, 1943
Industrial stocks
20,003.97
Aug. 4, 1943
5,676.63
TOTAL
$95,860.41
*241 During all the years taxpayer had been in business he permitted his profits to remain in the business and withdrew only amounts required for the support and maintenance of himself and family, and the education of his children. The above investments were made at the suggestion of his father, who was of the opinion that more cash was carried in the bank account than necessary or expedient. No part of the deficiencies herein was due to fraud with intent to evade taxes. Opinion VAN FOSSAN, Judge: Three questions are presented: (1) Whether a deduction is allowable under section 23 (a)(1) of the Internal Revenue Code for each of the fiscal years ended September 30, 1941, 1942 and 1943 of 25 per cent of the net profits of the business as compensation of J. A. Arbogast, father of decedent, and consequent on an alleged contract, and (2) whether the amounts paid to decedent's wife, son and daughter in the fiscal year 1942 and 1943 are deductible under section 23 (a)(1) as compensation for personal services rendered by them. The third issue is that of fraud. None other of the several adjustments made by the Commissioner is contested by petitioner. In the returns *242 for the taxable years there were claimed as compensation for J. A. Arbogast (the father of decedent) the amounts of $6,023.86 for the fiscal year 1941 and $12,000 for each of the fiscal years 1942 and 1943. Of these amounts claimed the Commissioner disallowed $4,575.72, $7.63 and $1,383.63 respectively, thus allowing as deductions for compensation for J. A. Arbogast $1,448.14, $11,992.37 and $10,616.37. No explanation is given in the notice of deficiency for the disallowance of the portion of the compensation as above set forth. However, the brief of the respondent indicates that the amounts allowed were the amounts actually paid to or withdrawn by J. A. Arbogast. It is argued by respondent that the services of J. A. Arbogast were not worth any more than the compensation actually paid to him and allowed by the Commissioner and that 25 per cent of net profits, now claimed, would be a grossly exorbitant allowance for his personal services. It is contended by petitioner that a deduction in an amount equal to 25 per cent of the net profits as finally determined by this Court is allowable in the taxable years as compensation due J. A. Arbogast. This contention is founded in part on *243 a purported written contract under the terms of which J. A. Arbogast was entitled to receive as compensation 25 per cent of net profits of decedent's business. It is argued that the entire 25 per cent of net profits, whether paid or not, is deductible each year since J. A. Arbogast was in complete charge of financial matters, including the bank account of decedent, and that therefore payment of the compensation was under his complete control at all times. No claim is made that J. A. Arbogast was entitled to the 25 per cent share in profits as a partner in the business. The alleged agreement was not adduced in evidence. Decedent testified that the compensation of 25 per cent of the net profits was his father's idea; that his father had prepared a typewritten agreement to that effect, which decedent had signed; that the last time he had seen the agreement was in the fall of 1927, and that, although search had been made, it had not been found. The returns of decedent, prepared by his father, show no deduction of 25 per cent of reported net profits as compensation for services rendered by the father, except the return for the fiscal year 1941. In the other returns in evidence the net *244 profits, including the deductions of compensation for J. A. Arbogast, and the amount claimed as compensation for him, are as follows: Fiscal
Reported
Amount
Year
Net Profits
Claimed
1938
$ 6,706.77
Not shown
1939
12,288.22
$1,000
1940
12,135.95
2,000
1942
44,102.81 (including
$12,000 paid)
12,000
1943
46,481.73 (to wife and
children)
12,000 There is no evidence that the unpaid portion of the 25 per cent of net profits in 1939 and 1940, or prior years, was credited to the amount of the father or that any amount in excess of 25 per cent of the profits in 1942 and 1943 was charged to his account as payment on account of prior unpaid credits to such account. There is no evidence that the father reported 25 per cent of the net profits as taxable income in his income tax returns. Since the idea of the contract was that of the father and since he was in charge of the bookkeeping and finances, it is reasonable to assume that, if there had been a contract which was considered by decedent and his father binding upon them, the father would have either withdrawn the 25 per cent of net profits in full or credited himself in an account on the books of *245 the business with any amount unpaid to which he was entitled under the contract. On the record we are unable to give any credence to the testimony relating to the contract in question. Its existence was not satisfactorily proved. Section 23 (a) (1) permits deduction, as an ordinary and necessary business expense paid or incurred during the taxable year in carrying on a business, of a "reasonable allowance for salaries or other compensation for personal services actually rendered." It appears that 90 per cent of the business obtained was due to advertising. This was taken care of primarily by decedent. The products manufactured were developed by decedent. In addition, in his own words, he attended to the "manufacturing, and the advising and sale of the fishing tackle." Except for the loan of $1,000, the father made no financial contribution to the business. The amounts allowed in 1942 and 1943 are substantially greater than the amount allowed in 1941 and prior years. The evidence fails to establish that any amount in excess of the amount allowed as compensation for J. A. Arbogast was actually or constructively paid or incurred in each taxable year by decedent in carrying on his *246 business. Nor is there evidence showing that 25 per cent of the net profits or any amount above the amounts allowed would have constituted reasonable compensation for the services rendered by the father. Accordingly, the action of the respondent in this respect must be approved. Ohio Battery & Ignition Co., 5 T.C. 283, cited by petitioner, is clearly distinguishable on the facts. The next question is whether or not the amount of $6,000 paid to decedent's wife and the amount of $3,000 paid to each of his two children in the fiscal years 1942 and 1943 are deductible. The claim of petitioner that such amounts are deductible in the fiscal years 1942 and 1943 is also based, in part, upon written agreements, which are in evidence. As to these agreements, which purported to create a partnership agreement, the decedent testified that he did not recall the agreements very well; that they were the idea of his father; that he signed them at his request, and that "My father realized that I was in bad health, and that my family was gradually going to have to take over more and more of the business. He said the way to do that is get started right now on the partnership." No *247 claim is made, however, that the wife or children were entitled to the distribution of the amounts paid to them as partners or that the agreements were partnership agreements or created a partnership between them and decedent for income tax purposes. It is claimed that the amounts paid are deductible under section 23 (a) (1) as compensation for personal services rendered. It is not disputed that the wife and children worked in the business during their spare time. The wife at first was paid $15 a week and later $25 a week. The son and daughter were paid for their services as rendered and when employed full time received a fixed amount as salary for their services. There is no evidence that they received less than the compensation paid to other employees doing similar work. Presumably the amounts paid the wife and children were deducted in the returns as a "labor" expense of the business. At least there is no evidence that they were not so deducted. It is indicated that the amounts paid pursuant to the agreements were intended as compensation for additional services to be rendered because of the ill health of decedent. There is no convincing evidence that any of them devoted more *248 time or rendered more important and valuable services than they had prior to the fiscal years 1942 and 1943. On the contrary, the record shows that they devoted less time to the business in 1942 and 1943 than they had theretofore. In any event, they did not "devote their knowledge, time and skill to the management of the business" as required by the agreements. Furthermore, the amounts of $6,000 and $3,000 paid, based upon the reported net income, were substantially more than was required to be paid under the agreements, the wife being entitled to 10 per cent, and each of the children to five per cent, of the net profits of the business as determined by the report made for Federal income taxes. The burden rests upon the taxpayer to show that the deduction claimed comes within the terms of the statute. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435. This has not been done. The disallowance of the deduction of the amount of $6,000 paid to the wife and $3,000 paid to each of the children in the fiscal years 1942 and 1943 is approved. The Commissioner determined that the deficiencies for the fiscal years 1942 and 1943 are due to fraud with intent to evade tax and *249 asserted the 50 per cent penalty provided in section 293 (b) of the Internal Revenue Code. The first and basic element in fraud is a fraudulent intent, - a state of mind which, if translated into action, is well calculated to cheat or deceive someone, here the Government. This state of mind may be express, or implicit in action, but its existence must be proved by clear and convincing evidence. Fraud is never presumed. The burden of proof rests on the Government. Petitioner's decedent was a thorough-going disciple of Isaac Walton, but with this variation - he successfully capitalized his interest in and knowledge of fishing. However, and perhaps characteristically, he was more interested in fishing and fishing equipment than in the efficiency of his business office. The evidence reveals inefficiency but it does not show that the taxpayer or his father intended to conceal income or evade taxes. Although the agreements covering compensation payable to taxpayer's wife and children would bring about the reallocation of taxpayer's income from his business within his intimate family group, such agreements were not per se fraudulent. Taxpayer's father, in reporting *250 income for the fiscal years 1942 and 1943, as well as in 1941, employed a hybrid method, partly cash and partly accrual. Although the books of account were inadequate and not in conformity with any recognized method of accounting, they afforded a basis, except for lack of proper inventories, for the checking of the returns. Many of the adjustments, including sales, were made in order to compute income upon the cash receipts and disbursements basis. Expenses not paid until after the close of a fiscal year were disallowed and restored to income but allowed in the following year when paid. That the petitioner is not contesting certain adjustments is not an admission of fraud. "Failure to contest an adjustment made in determining the deficiency is not proof of fraud." Oscar G. Joseph, 32 B.T.A. 1192, 1204. Neither is the fact that numerous adjustments were necessary. Watson-Moore Co., 30 B.T.A. 1197. The respondent was able to make the adjustments by checking the books and records of taxpayer. It also appears that when taxpayer learned that his bookkeeping was stated by revenue agents to be irregular and erroneous, he employed a certified public accountant to *251 assist in checking his accounts to correct any discrepancies found by such agents. Similar adjustments were made in the fiscal year 1941, as to which year no fraud penalty was imposed. The negligence penalty imposed for 1941 is not in dispute. The respondent actually allowed numerous additional deductions, which together with other evidence, indicate negligence, carelessness, and ignorance of good accounting, but not fraudulent intent. The use of inventories in computing income for the fiscal years 1942 and 1943 and changing from "a cash receipts to the inventory basis," pointed to by respondent on brief, without first obtaining the permission of the Commissioner, is not evidence of fraud. No inventories were used in computing income prior to the fiscal year 1942 for the reason, as stated in the returns, that inventories were practically the same from year to year. We have carefully studied the record in this case but find no fraudulent intent. True there is gross ignorance of proper accounting; there were inexperience and inexpert action in the keeping of records which resulted in many errors, - but no more. There is absent the requisite quantum of proof to establish fraud. This *252 being true, respondent's case of fraud falls to the ground and with it the penalties. Absent a finding of fraud, section 6 of the Current Tax Payment Act of 1943 becomes applicable. The provisions of the stated section will be given effect in the computation under Rule 50 consequent hereon. Decision will be entered under Rule 50. Footnotes
*. This name appears in the record both as Nellie E. Arbogast and Nellie M. Arbogast.↩
1. Petitioner's decedent died after the hearing herein, and the estate was substituted as the petitioner.↩